**Westlaw**

238 F.Supp.2d 435

Page 1

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

**H**
PARCC Health Care, Inc. v. U.S.
D.Conn.,2002.

United States District Court,D.
Connecticut.
PARCC HEALTH CARE, INC.
v.
UNITED STATES of America
**No. 3:01CV379.**

June 27, 2002.

Owner of nursing home brought action seeking refund of penalties assessed by Internal Revenue Service (IRS) against it for returned checks, failure to timely file quarterly federal employment tax returns, and failure to deposit and pay employment taxes withheld from its employees. On cross-motions for summary judgment, the District Court, Arterton, J., held that: (1) owner did not have reasonable cause for its late payment of employment taxes, but (2) its reliance on single employee to file tax returns and to ensure that employment taxes were being paid did not, by itself, constitute "willful neglect."

Motions granted in part, and denied in part.
West Headnotes
**[1] Internal Revenue 220 ☞5219.10**

220 Internal Revenue
    220XXXI Penalties and Additions to

Tax
        220XXXI(B) Grounds and Amount
            220k5219.10  k.  Reasonable
Cause. Most Cited Cases
Owner of nursing home did not have reasonable cause for its late payment of employment taxes, and thus was properly assessed penalties, despite its contentions that it failed to pay its taxes because of its financial difficulties, that federal and state law precluded it from cutting other expenditures, and that it reasonably relied on accountant to file tax returns; owner met its other financial obligations during relevant time period, did not reduce salaries, made its rental payments, and paid entertainment, travel, automobile and education expenses. 26 U.S.C.A. §§ 6651, 6656, 6657; 26 C.F.R. §§ 1.6161-1(b), 301.6651-1(c), 301.6557-1(b).

**[2] Internal Revenue 220 ☞5217**

220 Internal Revenue
    220XXXI Penalties and Additions to
Tax
        220XXXI(B) Grounds and Amount
            220k5217  k.  Failure to Make
Returns. Most Cited Cases
Corporate taxpayer's reliance on single employee to file tax returns and to ensure that employment taxes were being paid did not, by itself, constitute "willful neglect" under statute prescribing civil penalties to ensure timely filing of tax returns. 26

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
(Cite as: 238 F.Supp.2d 435)

Page 2

U.S.C.A. § 6651.

Kenneth A. Votre, Votre & Associates, New Haven, CT, for Plaintiff.
Alejandro L. Bertoldo, Elizabeth Lan, U.S. Department of Justice Tax Division, Washington, DC, for Defendant.

## MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT [16, 21]

ARTERTON, District Judge.

Plaintiff PARCC Health Care, Inc. (" PARCC") seeks a refund of penalties assessed by the Internal Revenue Service against it for returned checks, failure to timely file quarterly federal employment tax returns and failure to deposit and pay employment taxes withheld from its employees. PARCC and the United States have now cross-moved for summary judgment. While PARCC does not dispute that it committed the violations, the parties disagree as to whether PARCC is liable for the penalties.

### I. Factual Background

PARCC operates Astoria Park, a skilled nursing home facility in Bridgeport, Connecticut. PARCC has been owned by Donald Franco since April 1985. Franco is the president, chief executive officer and sole shareholder of PARCC, and he and his wife are the sole members of PARCC's board of directors. During the relevant time period, Michael Fiore was the administrator of PARCC, and Franco was the assistant administrator.

PARCC's data processing for receivables, payables and cost reports is handled by Paragon Group, a management services corporation. Franco is the president and CEO of Paragon Group. In 1985, Paragon Group hired Colleen Hartigan, a licensed CPA, as a controller. She was later promoted to chief financial officer of Paragon Group. Her duties included preparing *437 payroll tax returns, corporate income tax returns, payroll checks, Medicare and Medicaid cost reports and the company's monthly financial statements. Hartigan also took care of the company's financial books and records. She was authorized to use Franco's signature stamp to prepare checks, including payroll checks, on behalf of PARCC. Hartigan resigned from Paragon in August 1998.

Franco claims that Fiore, PARCC's administrator, and he were responsible for determining which of PARCC's creditors were paid each month, and that Hartigan also participated in that decision-making. Franco Aff. ¶ 53. According to Franco,

Ms. Hartigan, Mr. Fiore and I would get an accounts payable journal every month and would look at those vendors that had to be paid and would look at the dollars that they received for that period or that month and they would choose vendors and what they would pay them and would send that down to Paragon to cut checks. Due to our obligations to our patients to feed, house

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

and care for them, and our obligations under Connecticut law, to maintain staffing to care for patients in our facility[,][a]t times, essential services were paid before the IRS.

Franco Aff. ¶ 53; *see also id.* at ¶ 54 (" PARCC paid vendors providing essential services to patients, before obligations to the IRS."). Hartigan maintains that she " had limited input with respect to the company's finances." Hartigan Aff. ¶ 7. It is undisputed that the payroll tax information was not included on the vendor lists of creditors to be paid. Franco dep. at 104-05.

Franco claims that "[a]t no time did Ms. Hartigan tell me that federal taxes were not being paid." Franco Aff. at ¶ 55; *see also id.* at ¶ 58 ("During the periods at issue in this lawsuit, Ms. Hartigan never informed me of the insufficient funds to pay the payroll and the payroll taxes to the IRS."). In his deposition, Franco similarly stated that Hartigan "never told me that those payroll taxes weren't being paid," and that he never asked her about it because he assumed they were being paid. Franco dep. at 75. The Government, however, has submitted an affidavit from Hartigan, in which she states:
During the periods at issue in this lawsuit, there were insufficient funds to pay all of the creditors of PARCC, including the withholding taxes to the IRS. During the periods at issue in this lawsuit, I informed Mr. Franco of the insufficient funds to pay the payroll which included payroll taxes to

the IRS, however, Mr. Franco was not interested in discussing this matter with me. Instead, Mr. Franco told me which creditors to pay, and to make sure employees were paid, and to make payment arrangements with the IRS, which I did on at least three separate occasions. The payments were made out of Paragon's office as authorized by Paragon. The reason why the payroll taxes were not being paid for PARCC to the IRS was because PARCC was not taking in enough money at that time. Before I left Paragon Group, I gave Mr. Franco a pile of uncashed checks, which were not given to creditors because there was not enough money in the bank account of PARCC to cover these checks.

Hartigan Aff. ¶ 9.

According to Franco, Hartigan "had complete control over payroll and corporate taxes. She did not need permission to pay the taxes, to file the returns or to deposit the payroll taxes. I generally do not nor was I offered the opportunity to review Ms. Hartigan's books. " *Id.* Franco explained that because Ms. Hartigan was a CPA, he relied on her expertise and *438 did not retain outside accountants to review the returns. *Id.* at ¶ ¶ 55-56. Hartigan signed PARCC's quarterly tax returns for the quarterly periods ending September 30, 1994 through December 31, 1997 (the periods at issue in this litigation). Franco and Hartigan signed the annual federal unemployment returns. *Id.* Hartigan

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

maintains that she left employment with Paragon because of "the lack of input ... from Mr. Franco with respect to the company's finances. Although I was supposed to have weekly meetings with Mr. Franco, these meetings were frequently canceled by Mr. Franco." Hartigan Aff. ¶. 3.

After Hartigan ceased working at PARCC, Franco claims that he "ultimately [found] evidence of mismanagement by her with respect to the payroll taxes at issue in this lawsuit. In fact, I found checks drawn to the IRS which appeared on statements created by Ms. Hartigan which were not sent to the IRS." *Id.* at ¶ 59.

The penalties at issue here began to be assessed in October 1995, and continued to be assessed through September 1998. The IRS Certificates of Assessments and Payments detail a series of partial and late payments by PARCC throughout this time period and the imposition of various penalties for the late payments, some of which were paid by PARCC. In March 1999, the IRS received requests for abatement of penalties from PARCC. In the request for refund and abatement, PARCC cited Hartigan rather than the its financial condition as the cause of the late or missing payments. The claims for refund were denied by the IRS on March 11, 1999.

PARCC now claims that its financial condition was the reason taxes were unpaid. PARCC receives reimbursement from the state of Connecticut under Medicaid based upon cost reports filed with the state Department of Social Services the previous year. Hartigan prepared the costs reports for the periods at issue in this litigation, and Franco states that he signed them but did not review the reports. Franco Aff. ¶ 60.

For the year October 1, 1994 through September 30, 1995, PARCC's cost report indicate that it spent $13,177 for holiday parties and/or gifts to staff, $2,138 for employee travel, $8,510 for education expenses related to seminars and conventions, $4,386 for automobile expenses and $9,674 for entertainment. According to Franco, these were reimbursable expenses paid by the Medicaid system, and "[i]f these funds had not been expended as set forth in the cost reports, we would not have received reimbursement for them. They would not have been available to pay taxes. Our rates would simply have fallen lower." *Id.* at ¶ 61. During the 1994 cost year, PARCC paid $1,386,766 in rental payments to Franco, who claims to have used those payments to pay the mortgage owed on the facility.[FN1] Franco states that he made no profit on the rental of the property to PARCC. Franco also states that he paid over $11,386,766 in mortgage payments, taxes and escrow funds.[FN2] Total wages and salaries paid by PARCC for the 1995 cost year were $3,942,149. PARCC paid the total amount of $458,991 for worker's compensation, health and life insurance for the 1995 cost year.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435                                                                                           Page 5

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

FN1. PARCC does not own the land and buildings on which it is located. Franco refinanced the mortgage with a HUD-issued loan of approximately $9,300,000 to obtain a lower interest rate.

FN2. This is presumably a typographical error, as the rental payments from PARCC to Franco were $1,386,766.

**\*439** During the 1995 to 1996 cost year, PARCC reported spending $7,879 for holiday parties and/or gifts to staff, $2,976 for employee travel, $6,078 for education expenses related to seminars and conventions, $7,110 for automobile expenses and $6,663 for entertainment. These expenses were reimbursed by Medicaid. The total wages and salaries paid in the 1996 cost year was $3,827,088, and PARCC paid an additional $473,267 for workers' compensation, health and life insurance for employees. PARCC also paid $1,029,343 in rental payments to Franco. The rental payments were reduced in 1995 after Franco refinanced the mortgage to reduce the rate from fourteen percent to eight percent. Again, Franco asserts that all rental payments were applied to the mortgage payments. Franco Aff. ¶ 62.

For the 1996 to 1997 cost year, PARCC reported spending $3,049 for holiday parties and/or gifts to staff, $2,384 for employee travel, $10,854 for education expenses related to seminars and conventions, $2,940 for automobile expenses and $7,718 for entertainment. PARCC's rental payments to Franco for the 1997 cost year were $1,071,592. PARCC paid $3,696,703 in wages and salaries, and an additional $388,035 for workers' compensation, health and life insurance for employees. These expenses were reimbursed by Medicaid.

Franco asserts that during 1994 to 1995, PARCC sustained unexpected losses of $1,240,490.[FN3] These losses were caused by a loss of over $600,000 in revenue as a result of certain Medicare take-backs, which are funds withheld by Medicare because of claimed prior year over-payments, as well as major rate reductions by Medicaid. Franco claims PARCC sustained losses exceeding $1,000,000 in 1996 and 1997. According to Franco, from 1993 to 1998, "Medicaid cut PARCC's rates substantially due to the rate setting procedure in Connecticut." Franco Aff. ¶ . 71. Although PARCC appealed each reduction, "because the rate setting was based upon prior year figures, the rate caused a massive reduction in revenues." *Id.* Franco also asserts that " during the periods at issue, my salary was decreased. PARCC did not give raises to its employees for over eighteen months. No employees were laid off because of minimum staffing requirements of Connecticut law. Benefits to PARCC's employees were not decreased nor were they increased." Franco Aff. at ¶ 65. It is undisputed that PARCC's operations and programs were not scaled back during this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435

Page 6

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

time period, and PARCC did not consider that an option because cutting-back operations would have led to a reduction in revenue. Franco dep. at 118-19.

> FN3. The previous year (1993-94), PARCC had losses of only $30,802. Franco asserts that " [t]his was a normal year for PARCC." Franco Aff. ¶ 68.

## II. Standard

Summary judgment is appropriate where " there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It may be granted " [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In assessing the record, the Court draws all reasonable inferences **\*440** and resolves all ambiguities in favor of the non-moving party. *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 107 (2d Cir.1998) (citations omitted).

On cross-motions for summary judgment " neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (*citing Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981)). " Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314.

## III. Discussion

The Internal Revenue Code requires employers to deduct and withhold an employee's contributions to Social Security and Medicare ("FICA") and income taxes from the employee's wages. *See* 26 U.S.C. §§ 3102(a), 3401. Withheld income taxes are held by the employer in trust for the United States, and must be deposited in an approved bank at specified intervals, depending on the amount withheld. *See* 26 U.S.C. §§ 7501(a), 6302 . In addition, employers must file quarterly payroll tax returns indicating the amounts withheld from employees and the taxes to be paid. *See* 26 U.S.C. § 6011(a). When the quarterly returns are filed, the employer must also make full payment of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435

Page 7

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

the FICA taxes for that quarter, if they have not already been deposited with an approved financial institution. *See* 26 U.S.C. § 6151. Employers are also subject to unemployment tax with respect to each employee, and must file annual unemployment tax returns. *See* 26 U.S.C. §§ 3301, 6071.

If any employer does not timely comply with these requirements, the tax code imposes various penalties. *See* 26 U.S.C. § 6651 (penalties for failure to timely file return and pay required taxes), 6656 (penalties for failure to timely make required payroll tax deposits), 6657 (penalties for returned checks). Sections 6651 and 6656 provide that penalties imposed pursuant to those sections shall not be imposed where the failure to comply was due to "reasonable cause" and not " willful neglect." Section 6657 provides that penalties for returned checks "shall not apply if the person tendered such check in good faith and with reasonable cause to believe it would be duly paid." 26 U.S.C. § 6657; 26 C.F.R. § 301.6557-1(b).

### A. "Reasonable cause"

Treasury Department regulations interpreting the term "reasonable care" provide that:
If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause. A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in § 1.6161-1(b) of this chapter) if he paid on the due date. In determining whether the taxpayer was unable to pay the tax in spite of the exercise of ordinary business care and prudence in providing for payment of his tax liability, consideration will be given to all the facts and circumstances of the taxpayer's**441** financial situation, including the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for the payment of the tax.... A taxpayer will be considered to have exercised ordinary business care and prudence if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due.
In determining if the taxpayer exercised ordinary business care and prudence in providing for the payment of his tax liability, consideration will be given to the nature of the tax which the taxpayer has failed to pay. Thus, for example, facts and circumstances which, because of the taxpayer's efforts to conserve assets in marketable form, may constitute reasonable cause for nonpayment of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435

Page 8

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

income taxes may not constitute reasonable cause for failure to pay over taxes described in section 7501 that are collected or withheld from any other person.

26 C.F.R. § 301.6651-1(c)(1) & (2).

Finally, 26 C.F.R. § 1.6161-1(b) defines undue hardship as follows:
The term "undue hardship" means more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer for making payment on the due date of the amount with respect to which the extension is desired. If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship.

The Second Circuit has recently held that financial difficulties may, under some circumstances, establish reasonable cause for a failure to pay taxes, including employee withholding, or "trust fund" taxes, relying in part on these Treasury regulations, which "clearly require a factual assessment of the taxpayer's financial situation to determine whether it has exercised ordinary business care and prudence in responding to competing financial obligations." *Fran Corp. v. United States,* 164 F.3d 814, 819 (2d Cir.1999). In *Fran Corp.,* the Second Circuit affirmed the district court's holding that the corporation had failed to

demonstrate reasonable cause for failure to file and pay its taxes, and therefore did not reach the issue of whether the failure to pay was due to willful neglect. *Id.* The corporation in that case argued that it had not paid its taxes because the funds were needed to complete two construction projects to avoid default; however, the Second Circuit noted that it: had paid rent to its president during the period of delinquency, despite the fact that the president owed the corporation over $150,000; had continued to fund automobile leases and repairs that were admittedly not essential for the business; and had over $15,000 in entertainment expenses, characterized by the corporation as business development expenses, that were clearly not necessary to the completion of the two projects. *Id.* at 819-20. The court also found that " [p]erhaps most important is Fran's failure to provide any evidence to show that it placed its obligations to the IRS before those to any and all creditors not directly related to the two projects that defaulted. Absent such a showing, Fran cannot demonstrate that it acted prudently in disregarding its legal obligations to pay and deposit the employment taxes." *Id.* at 820.

Here, PARCC argues that it had reasonable cause for the failure to pay its taxes because of its financial difficulties, **\*442** noting that Franco re-financed his mortgage in 1994 to reduce the rental payments owed by PARCC by over $400,000 per year, and that PARCC "cut

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435

Page 9

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

costs wherever possible" and appealed the rate decreases. PARCC Br. at 13. PARCC therefore claims to have acted prudently in the face of an unexpected $1.2 million loss in 1994. Because of the nature of PARCC's business, it maintains that it could not have scaled back operations under law without jeopardizing the care and well-being of patients, and that any "reduction in staff, ordering business expenses, rent or other factors will simply reduce the reimbursement." *Id.* at 14-15. Citing the state reimbursement policy, PARCC argues that its travel, education and gift expenditures cannot be deemed imprudent because cutting back these projected expenditures would have resulted in a "take back" by the state. PARCC contends that "[a]ll of the arguments raised by the United States would have caused the closing of the facility and harm to all the patients." PARCC Br. at 13. PARCC further argues that its failure to file the tax returns was attributable to Hartigan's conduct, and should be excused because she failed to inform Franco that the returns were not being filed.[FN4]

> FN4. At oral argument, PARCC conceded that the penalties for bounced checks were properly assessed.

The Government, in turn, argues that neither mismanagement by Hartigan nor the financial difficulties described by Franco are sufficient to establish reasonable cause. First, the Government argues that because PARCC failed to implement any internal controls to ensure that its tax responsibilities were met, the exclusive reliance on Hartigan demonstrates a lack of ordinary business care and prudence. In *United States v. Boyle,* the Supreme Court held that the taxpayer's reliance on an attorney to file a tax return was not reasonable cause for failure to meet a deadline, where the claim was not that the attorney's erroneous legal advice led the taxpayer to file late but simply that the attorney failed to file any tax return at all. 469 U.S. 241, 250-52, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). The Supreme Court observed that:

To say that it was "reasonable" for the [taxpayer] to *assume* that the attorney would comply with the statute may resolve the matter as between them, but not with respect to the [taxpayer's] obligations under the statute.... It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under § 6651(a)(1).

*Id.* at 250, 252, 105 S.Ct. 687 (emphasis in original).

In support of its contention that Hartigan's failure to file returns is not reasonable cause, the Government relies on *Universal Concrete Products Corp. v. United States,* 90-2 U.S.T.C. ¶ 50,440, 1990 WL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106584 (E.D.Pa. July 24, 1990) ("a corporation's failure to implement internal checks and controls over the employee responsible for tax obligations demonstrates a lack of ordinary business care and prudence, and as such, negates a claim that late filings, deposits, and payments are due to reasonable cause"), *aff'd* 941 F.2d 1204 (3d Cir.1991); *Thom v. United States,* 80-2 U.S.T.C. ¶ 9814, 1980 WL 1690 (D.Or. Oct. 23, 1980) (failure of unsupervised bookkeeper to file tax returns not reasonable cause); ***443** Obstetrical & Gynecological Group, P.A. v. United States,* 79-2 U.S.T.C. ¶ 9511, 1979 WL 1419 (D.Colo. July 6, 1979) (lack of supervision of employee who knew of duty to file tax returns was evidence that failure to file had no reasonable cause).

[1] The Court agrees with the Government that PARCC has not offered any evidence from which a reasonable fact-finder could conclude that the failure to file tax returns was attributable to reasonable cause and not willful neglect. Even if PARCC acted reasonably in trusting Hartigan, a trained CPA, to file the returns, no explanation has been offered for her failure to do so. Accordingly, the Government is entitled to summary judgment as to the claims for refund of penalties based on late filed returns.

The Government argues that because PARCC met its other financial obligations during the relevant time period, did not reduce salaries (other than Franco's), made

its rental payments to Franco, and paid entertainment, travel, automobile and education expenses, it has failed to demonstrate that its financial difficulties were so great as to excuse payment of its taxes. The Government also notes that although PARCC froze salaries in 1995, the freeze was in place only for eighteen months, and then PARCC offered raises again.[FN5] Finally, the Government argues that PARCC has offered no evidence that it made any effort to comply with federal tax laws, as required by *Fran Corp.*

> FN5. Franco contends that this was done to avoid losing critical staff and avoid unionization.

PARCC relies on *East Wind Industries, Inc. v. United States,* 196 F.3d 499 (3d. Cir.1999), in which the Third Circuit found both reasonable cause based on financial hardship and a lack of willful neglect where the taxpayers had initially acceded to bribery demands of corrupt defense agency employees who were the sole purchasers of the goods manufactured by the taxpayers, and then, after the taxpayers refused to pay the bribes, refused to honor existing contracts or consider the taxpayers for new contracts. The taxpayers eventually sued the defense agencies, and recovered $2.1 million in settlement, but not before they failed to pay withholding taxes for six years. The Third Circuit noted that although the taxpayers had chosen to pay other creditors and employees before the IRS, the taxpayers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had proven that they exercised ordinary business care and prudence and that undue hardship would have resulted if they had paid the taxes when due. *Id.* at 509-10.

As evidence of undue hardship, the court considered that the owners of the corporation "incurred substantial personal debts by obtaining loans and a mortgage on their residence in order ' to provide additional cash for the taxpayers to stay in business," rent was not paid, suppliers were not paid the personal funds were used to pay only essential creditors and a small number of employees retained to re-work the inventory, had those employees not been retained, the taxpayers would have been unable to function as a going concern, and finally, that only market for the taxpayers' inventory was the corrupt defense agencies. The court also found that the taxpayers had exercised ordinary business care and prudence in providing for the payment of their taxes:

Any income received by the Taxpayers on government contracts was used to pay either taxes owed to the IRS or employees' wages. Consequently, the Taxpayers did not pay suppliers, rent, health and welfare premiums, employees' union dues, and workers' compensation insurance premiums. Utility companies were only paid from [the vice-president's] personal funds at the eleventh hour after the companies threatened **444** to shut off service.... [The vice-president] secured a mortgage on his personal residence and sold several personal assets to obtain cash to pay creditors after [his] personal funds were depleted.... Finally, the evidence

shows ... that if the Defense Agencies had paid the Taxpayers what was owed under the contracts, the Taxpayers would have had sufficient funds to pay their employment taxes and other debts when due. Thus, it appears that the Taxpayers made reasonable efforts to conserve sufficient assets in marketable form, by maintaining $750,000 of inventory for the Defense Agencies, to satisfy their tax liability, and despite such efforts, were unable to pay their employment taxes when they became due.

*Id.* at 510-11.

This case clearly falls somewhere between *Fran Corp.* and *East Wind.* PARCC's financial troubles appear to have been caused by unexpected rate-cutting in 1994 by the state of Connecticut, rather than its own expenditures. Further, the nature of PARCC's business is claimed to have been such that essential vendors had to be paid to ensure adequate care of its patients and compliance with state and federal law. As the Second Circuit noted in *Fran Corp.,* to prevail on a claim of undue financial hardship, PARCC must provide evidence to show that "it placed its obligations to the IRS before those to any and all creditors not directly" necessary to its survival as a going concern. *Id.* at 820.

Although the Government notes that PARCC has not offered any evidence other than Franco's affidavit that all the payments to creditors were necessary to avoid incurring penalties from the state, the Government has not offered any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435                                                                Page 12

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
(Cite as: 238 F.Supp.2d 435)

evidence suggesting that Franco's affidavit testimony is inaccurate in this respect.[FN6]

> FN6. More troubling, however, is the Government's observation that some of the losses claimed by Franco are not corroborated by the supporting documentation. Thus, the corporate tax returns reflect a loss for the 1995 to 1996 years of approximately $450,000 and a 1996 to 1997 year loss of approximately $25,000, less than half the $1,000,000 loss for those two years that Franco claimed was sustained. While the Government also alleges that PARCC has failed to offer evidence (other than the tax returns) that its financial losses were as great as reflected in the tax returns, the Government has not offered anything to suggest that the losses reflected in PARCC's corporate tax returns are inaccurate.

In *Fran Corp.*, the Second Circuit noted that "it will be the rare case where the government is made the 'unwilling partner in a floundering business,' without the employer incurring the duty to pay a penalty for having made such a choice, but it nonetheless remains for the court in each case to weight all of the factors identified in the Regulations." 164 F.3d at 819 ( quoting *Brewery, Inc. v. United States,* 33 F.3d 589, 593 (6th Cir.1994)). PARCC argues that the nursing home industry is so highly regulated that the Government-although admittedly not the IRS-is more akin to a voluntary partner in a struggling industry. According to PARCC, it would have been subject to federal civil and/or criminal penalties if it used the Medicare funding to pay taxes rather than for patient care and state Department of Health standards impose minimum staffing and other requirements. Thus, PARCC maintains that the unexpected reduction in rates in 1994 and the "take backs" created financial difficulties that it struggled to overcome for several years. The Government has not rebutted this claim of financial hardship with evidence that PARCC's expenditures were not necessary, or would not have resulted in even more detrimental "take backs."

Whether reasonable cause exists is a question of fact, and on this record, neither the Government nor PARCC has shown **445 that, drawing all inferences in the favor of the other party, a reasonable fact-finder would be compelled to conclude either that PARCC would have had such an undue burden if it had timely complied with its tax requirements that it had reasonable cause, or that PARCC's conduct was so lacking in diligence that it lacked reasonable cause as a matter of law. Thus, the Court concludes that whether or not PARCC's financial difficulties establish reasonable cause and not willful neglect for the failure to pay corporate taxes and to deposit withholding taxes remains a disputed issue for trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

## B. "Willful neglect"

The Supreme Court has held the term " willful neglect" means "a conscious, intentional failure or reckless indifference." *Boyle*, 469 U.S. at 245, 105 S.Ct. 687 (citations omitted). "In other words, 'a taxpayer seeking a refund must therefore prove that his failure ... was the result neither of carelessness, reckless indifference, nor intentional failure.' " *Fran Corp.*, 164 F.3d at 816 (*quoting Boyle*, 469 U.S. at 246 n. 4, 105 S.Ct. 687).

The Government also argues that PARCC's failure to meet its tax obligations was willful neglect, in light of Franco admissions that he failed to confirm that the returns were timely filed and simply assumed the payroll tax deposits were being made. According to the Government, because it is undisputed that PARCC failed to institute any safeguards to ensure compliance, this apathy demonstrates reckless indifference, and therefore willful neglect. The Government maintains that reposing all payment responsibility in one individual is willful neglect as a matter of law. The Court, finding no authority for such a proposition, declines to adopt such a *per se* rule.

In *East Wind*, the Third Circuit rejected the government's position that any intentional failure to pay employment taxes amounts to willful neglect, noting that:
The IRS has consistently taken the position that if a taxpayer cannot afford to pay trust fund taxes, no matter what the cause, it should close up shop. Both the economy and the federal fisc are negatively impacted by such an approach-the amount of money flowing into the economy and the fisc is reduced as a result of increased unemployment, idle buildings and plants, and decreased sales of goods and services. Under this approach, no one benefits. Where, however, a taxpayer keeps its business operating at a minimal level in order to collect moneys contractually due so that it can pay trust fund taxes and other debts, and does in fact collect the funds owed and pays its back taxes and other debts, the economy and federal fisc, including the IRS, benefits.

196 F.3d at 509. A critical fact in *East Wind*, however, was the role the government itself, as the defense agencies, played in causing the financial hardship suffered by the taxpayers. The court emphasized that this suggested that "the Government was not an unwilling partner in a floundering business, but an active participant." *Id.* Further, the court noted that the taxpayers' vice president had stated in his deposition that he paid "only those creditors whose services were essential to maintaining and reworking the inventory ... [and] that maintaining minimal business operations was required to institute adversary proceedings against the Defense Agencies and collect the $2.1 million settlement.... [He] further testified that he felt he had no choice but to pay employees from the funds received under government contracts because Delaware law makes it a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558
**(Cite as: 238 F.Supp.2d 435)**

criminal violation not to pay employees for time worked." *Id.* The court held that **\*446** under these circumstances, the decision "to pay those creditors, whose services were essential to maintaining and reworking the inventory, over the trust fund taxes" was not "a conscious, intentional failure or reckless indifference" and therefore not willful neglect. *Id.*

[2] From a review of the certificates of assessments, it is evident that PARCC made partial payments during this period, and that it was assessed and paid multiple penalties for the late filings. Hartigan's affidavit further makes clear that these payments were late because of the company's financial difficulties. Under th ese circumstances, PARCC's reliance on a single employee has not been shown to be unreasonable, and the evidence in the record does not compel the conclusion that the failure to file taxes was either a conscious, intentional failure or reckless indifference. Accordingly, summary judgment on the grounds of willful neglect is inappropriate.

### IV. Conclusion

For the reasons set forth above, PARCC's motion for summary judgment [# 21] is DENIED. The Government's motion for summary judgment [# 16] is GRANTED IN PART as to the claims for refunds of penalties based on the failure to file tax returns and bounced checks, and is DENIED IN PART as to the claims for refunds of penalties based on the failure to timely pay taxes.

IT IS SO ORDERED.

D.Conn.,2002.
PARCC Health Care, Inc. v. U.S.
238 F.Supp.2d 435, 90 A.F.T.R.2d 2002-5267, 2002-2 USTC P 50,558

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

PARCC HEALTH CARE, INC.,          :

        Plaintiff,          :

        v.          :          Civil No. 3:01CV00379
                  :          Honorable Janet Bond Arterton
UNITED STATES OF AMERICA,          :
COMMISSIONER OF INTERNAL          :
REVENUE, and DEPARTMENT OF          :
THE TREASURY,          :

        Defendants.          :
                  :

## STIPULATED DISMISSAL AND ENTRY OF JUDGMENT

It is hereby stipulated and agreed that, pursuant to 26 U.S.C. §§6621, and 6622, and 28

U.S.C. §1961(c), judgment may be entered in favor of the plaintiff, PARCC Health Care, Inc., and

against the United States of America, on plaintiff's claims to an overpayment of the penalties assessed

against plaintiff for failure to pay employment taxes (Form 941) withheld from the plaintiff's employees

for the following quarterly tax periods, and for the penalties assessed against plaintiff for failure to pay

employment taxes (Form 940) withheld from the plaintiff's employees for the following tax years, for an

overpayment in the following amounts, plus interest from the following dates of payment. Such

overpayment is subject to the rights and obligations of the Offer in Compromise submitted by Plaintiff

Page 1 of 11

on May 18, 2000, which was accepted by the Internal Revenue Service on June 15, 2000, copies of

which are attached hereto, as well as any other provisions of law.

| FORM | TAX PERIOD ENDING | PENALTY AMOUNT | DATE OF PAYMENT |
|---|---|---|---|
| 941 | September 30, 1995 | $375.49 | July 18, 1996 |
| 941 | December 31, 1995 | $9,423.55 | April 26, 1999 |
| 941 | March 31, 1996 | $6,466.38 | October 17, 1997 |
| 941 | December 31, 1996 | $3,233.65 | August 10, 1998 |
| 941 | March 31, 1997 | $285.19 | February 17, 1998 |
| 941 | June 30, 1997 | $1,016.64 | June 9, 1998 |
| 940 | December 31, 1995 | $156.35 | June 24, 1996 |
| 940 | December 31, 1996 | $42.12 | November 9, 1998 |
| 940 | December 31, 1997 | $281.99 | May 24, 2000 |

It is further hereby stipulated and agreed that, pursuant to 26 U.S.C. §§6621, and 6622, and

28 U.S.C. §1961(c), judgment may be entered in favor of the plaintiff, PARCC Health Care, Inc., and

against the United States of America, on plaintiff's claims to an overpayment of the penalties assessed

against plaintiff for failure to deposit employment taxes (Form 941) withheld from the plaintiff's

employees for the following quarterly tax periods, and for the penalties assessed against plaintiff for

failure to deposit employment taxes (Form 940) withheld from the plaintiff's employees for the

following tax years, for an overpayment in the following amounts, plus interest from the following dates

of payment. Such overpayment is subject to the rights and obligations of the Offer in Compromise

Page 2 of 11

submitted by Plaintiff on May 18, 2000, which was accepted by the Internal Revenue Service on June

15, 2000, copies of which are attached hereto, as well as any other provisions of law.

| FORM | TAX PERIOD ENDING | PENALTY AMOUNT | DATE OF PAYMENT |
|------|-------------------|----------------|-----------------|
| 941 | September 30, 1995 | $13,755.27 | July 18, 1996 |
| 941 | December 31, 1995 | $37,496.17 | April 26, 1999 |
| 941 | March 31, 1996 | $28,367.98 | July 21, 1997 |
| 941 | June 30, 1996 | $7,839.94 | October 17, 1997 |
| 941 | December 31, 1996 | $16,586.05 | August 10, 1998 |
| 941 | March 31, 1997 | $6,017.13 | February 17, 1998 |
| 941 | June 30, 1997 | $26,439.85 | June 9, 1998 |
| 940 | December 31, 1995 | $1,042.35 | June 24, 1996 |
| 940 | December 31, 1996 | $24,642.50 | November 9, 1998 |
| 940 | December 31, 1997 | $1,203.84 | May 24, 2000 |

It is further hereby stipulated and agreed that in all other respects the plaintiff's action for

overpayment is dismissed with prejudice, with each party to bear their respective costs, including any

attorneys' fees or other expenses of this litigation, except that plaintiff's claim for an overpayment of the

penalties assessed against plaintiff for failure to file timely quarterly employment tax returns, to pay and

deposit employment taxes withheld from the plaintiff's employees for the quarterly tax period ending

December 31, 1997, is dismissed for lack of jurisdiction.

Page 3 of 11

It is further hereby stipulated and agreed that the Court shall retain jurisdiction over the enforcement of this judgment.

For Plaintiff, PARCC Health Care, Inc.

KENNETH A. VOTRE
667 State Street
New Haven, Connecticut 06511
(203) 562-7955
Ct. 05981

IT IS SO ORDERED.
Date: 18 July 2002

For Defendant, United States of America,

ELIZABETH LAN
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, DC 20044

HON. JANET BOND ARTERTON
United States District Judge

FILED
Jul 18  2 59 PM '02
U.S. DISTRICT COURT
NEW HAVEN, CONN.

Page 4 of 11

**IRS**
Department of the Treasury
Internal Revenue Service
www.irs.gov
Form 656 (Rev. 1-2000)
Catalog Number 16728N

**Form 656**                    _Amended_

# Offer in Compromise

**Item 1 — Taxpayer's Name and Home or Business Address**

Name  PARCC Health Care Inc

Name  : Astoria Park

Street Address  725 Park Ave

City  Bridgeport          State  CT          ZIP Code  06604

Mailing Address (if different from above)

Street Address

City          State          ZIP Code

**Item 2 — Social Security Numbers**

(a) Primary

(b) Secondary

**Item 3 — Employer Identification Number (included in offer)**
06-1132548

**Item 4 — Other Employer Identification Numbers (not included in offer)**

**Item 5 — To:  Commissioner of Internal Revenue Service**

I/We (includes all types of taxpayers) submit this offer to compromise the tax liabilities plus any interest, penalties, additions to tax, and additional amounts required by law (tax liability) for the tax type and period marked below: (Please mark an "X" in the box for the correct description and fill-in the correct tax period(s), adding additional periods if needed).

☐ 1040/1120 Income Tax — Year(s)

☒ 941 Employer's Quarterly Federal Tax Return — Quarterly period(s) 3-31-97, 6-31-97, 3-31-98, 6-30-98, 9-30-98, 12-31-98, 3-31-2000

☒ 940 Employer's Annual Federal Unemployment (FUTA) Tax Return — Year(s) 12-31-98

☐ Trust Fund Recovery Penalty as a responsible person of (enter corporation name)

for failure to pay withholding and Federal Insurance Contributions Act Taxes (Social Security taxes), for period(s) ending

☐ Other Federal Tax(es) (specify type(s) and period(s))

Note:  If you need more space, use another sheet titled "Attachment to Form 656 Dated _____." Sign and date the attachment following the listing of the tax periods.
My 12in7

**Item 6 — I/we submit this offer for the reason(s) checked below:**

☐ Doubt as to Liability — "I do not believe I owe this amount." You must include a detailed explanation of the reason(s) why you believe you do not owe the tax in item 9.

☒ Doubt as to Collectibility — "I have insufficient assets and income to pay the full amount." You must include a complete financial statement, Form 433-A and/or Form 433-B.

☐ Effective Tax Administration — "I owe this amount and have sufficient assets to pay the full amount, but due to my exceptional circumstances, requiring full payment would cause an economic hardship or would be unfair and inequitable." You must include a complete financial statement, Form 433-A and/or Form 433B and complete item 9.

**Item 7**

I/we offer to pay $ 500,000.00

☐ Paid in full with this offer.

☐ Deposit of $ _____ is attached to this offer.

☒ No deposit.

Note:  Make all checks payable to:  The United States Treasury

Check one of the following:

☐ Cash Offer (Offered amount will be paid in 90 days or less.)

Balance to be paid in:  _____ 10, _____ 30, _____ 60, or _____ 90 days from notice of acceptance of this offer. If more than one payment will be made during the time frame checked, provide the amount and date of the payment on the line below.

☐ Short Term Deferred Payment Offer (Offered amount paid in more than 90 days but within 24 months.)

Amount of monthly payment _____

Monthly payment date _____

Date offered amount will be paid in full _____

Other terms for payment _____

☒ Deferred Payment Offer (Offered amount will be paid over the life of the collection statute.)

Amount of monthly payment $ 7,339.45

Monthly payment date 25th of each month.

Other terms for payment Payment will commence on the 25, 2001 and run for 109 consecutive months.

Page 5 of 11

Item 8 — By submitting this offer, I/we understand and agree to the following conditions:

(a) I/we voluntarily submit all payments made on this offer.

(b) The IRS will apply payments made under the terms of this offer in the best interest of the government.

(c) If the IRS rejects or returns the offer or I/we withdraw the offer, the IRS will return any amount paid with the offer. If I/we agree in writing, IRS will apply the amount paid with the offer to the amount owed. If I/we agree to apply the payment, the date the IRS received the offer remittance will be considered the date of payment. I/we understand that the IRS will not pay interest on any amount I/we submit with the offer.

(d) I/we will comply with all provisions of the Internal Revenue Code relating to filing my/our returns and paying my/our required taxes for 5 years or until the offered amount is paid in full, whichever is longer. In the case of a jointly submitted offer to compromise joint tax liabilities, I/we understand that default with respect to the compliance provisions described in this paragraph by one party to this agreement will not result in the default of the entire agreement. The default provisions described in Item 8(e) of this agreement will be applied only to the party failing to comply with the requirements of this paragraph. This provision does not apply to offers based on Doubt as to Liability.

(e) I/we waive and agree to the suspension of any statutory periods of limitation (time limits provided for by law) for the IRS assessment of the tax liability for the tax periods identified in Item 5. I/we understand that the statute of limitations for collection will be suspended during the period an offer is considered pending by the IRS (paragraph (m) defines pending).

(f) The IRS will keep all payments and credits made, received or applied to the total original tax liability before submission of this offer. The IRS may keep any proceeds from a levy served prior to submission of the offer, but not received at the time the offer is submitted. If I/we have an installment agreement prior to submitting the offer, I/we must continue to make the payments as agreed while this offer is pending. Installment agreement payments will not be applied against the amount offered.

(g) The IRS will keep any refund, including interest, due to me/us because of overpayment of any tax or other liability, for tax periods extending through the calendar year that the IRS accepts the offer. I/we may not designate an overpayment ordinarily subject to refund, to which the IRS is entitled, to be applied to estimated tax payments for the following year. This condition does not apply if the offer is based on Doubt as to Liability.

(h) I/we will return to the IRS any refund identified in (g) received after submission of this offer. This condition does not apply to offers based on Doubt as to Liability.

(i) The IRS cannot collect more than the full amount of the tax liability under this offer.

(j) I/we understand that I/we remain responsible for the full amount of the tax liability, unless and until the IRS accepts the offer in writing and I/we have met all the terms and conditions of the offer. The IRS will not remove the original amount of the tax liability from its records until I/we have met all the terms of the offer.

(k) I/we understand that the tax I/we offer to compromise is and will remain a tax liability until I/we meet all the terms and conditions

Page 6 of 11

of this offer. If I/we file bankruptcy before the terms and conditions of this offer are completed, any claim the IRS files in the bankruptcy proceedings will be a tax claim.

(l) Once the IRS accepts the offer in writing, I/we have no right to contest, in court or otherwise, the amount of the tax liability.

(m) The offer is pending starting with the date an authorized IRS official signs this form. The offer remains pending until an authorized IRS official accepts, rejects, returns or acknowledges withdrawal of the offer in writing. If I/we appeal an IRS rejection decision on the offer, the IRS will continue to treat the offer as pending until the Appeals Office accepts or rejects the offer in writing. If I/we don't file a protest within 30 days of the date the IRS notifies me/us of the right to protest the decision, I/we waive the right to a hearing before the Appeals Office about the offer in compromise.

(n) The waiver and suspension of any statutory periods of limitation for assessment of the tax liability described in Item 5, continue to apply:

- while the offer is pending [see (m) above]
- during the time I/we have not paid all of the amount offered
- during the time I/we have not completed all terms and conditions of the offer
- for one additional year beyond each of the time periods identified in this paragraph

(o) If I/we fail to meet any of the terms and conditions of the offer and the offer defaults, then the IRS may:

- immediately file suit to collect the entire unpaid balance of the offer
- immediately file suit to collect an amount equal to the original amount of the tax liability as liquidating damages, minus any payment already received under the terms of this offer
- disregard the amount of the offer and apply all amounts already paid under the offer against the original amount of the tax liability
- file suit or levy to collect the original amount of the tax liability, without further notice of any kind.

(p) The IRS generally files a Notice of Federal Tax Lien to protect the Government's interest on deferred payment offers. This tax lien will be released when the payment terms of the offer agreement have been satisfied.

(q) I/we understand that Internal Revenue Service employees may contact third parties in order to respond to this request, and I authorize such contacts to be made. Further, by authorizing the Internal Revenue Service to contact third parties, I understand that I will not receive notice pursuant to section 7602(c) of the Internal Revenue Code of third parties contacted in connection with this request.

**Item 9 — Explanation of Circumstances**

I am requesting an offer in compromise for the reason(s) listed below:

*Note: If you are requesting compromise based on doubt as to liability, explain why you don't believe you owe the tax. If you believe you have special circumstances affecting your ability to fully pay the amount due, explain your situation. You may attach additional sheets if necessary.*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Item 10**

If I/we submit this offer on a substitute form, I/we affirm that this form is a verbatim duplicate of the official Form 656, and I/we agree to be bound by all the terms and conditions set forth in the official Form 656.

Under penalties of perjury, I declare that I have examined this offer, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct and complete.

10(a) Signature of Taxpayer — proponent

Date

10(b) Signature of Taxpayer — proponent

Date

For Official Use Only

Signature of Authorized Internal Revenue Service Official

Title

Date    5-24-2000

| OFFICIAL USE ONLY |
| --- |
| MAY 2 4 2000 |

Department of the Treasury

INTERNAL REVENUE SERVICE
- 16 High Street, Stop 155
Hartford, CT 06103

Date of this Letter: JUN 15 2000

Person to Contact:
Howard Smith
Employee #: 06-01192
Phone#: (860)258-2086
08:15am-04:45pm Mon-Fri

Taxpayer ID#: 06-1132548
Offer Number: 060000276

PARCC HEALTH CARE, INC.
725 PARK AVENUE
BRIDGEPORT, CT 06604

Dear PARCC HEALTH CARE, INC.,

We have accepted your offer in compromise signed and dated by you on 05/18/2000. The date of acceptance is the date of this letter and our acceptance is subject to the terms and conditions on the enclosed Form 656, Offer in Compromise.

Please note that the conditions of the offer require you to file and pay all required taxes for five tax years or the period of time payments are being made on the offer, whichever is longer. This will begin on the date shown in the upper right hand corner of this letter. Additionally, please remember that the conditions of the offer include the provision that as additional consideration for the offer, we will retain any refunds or credits that you may be entitled to receive for 2000 or for earlier tax years. This includes refunds you receive in 2001 for any overpayments you made toward tax year 2000 or toward earlier tax years. The Notice of Federal Tax Lien will be released when the offer amount is paid in full.

If you are required to make any payments under this agreement, make your check or money order payable to the United States Treasury and send it to:
Internal Revenue Service
Offer in Compromise Unit
P.O. Box 9047 Stop 834
ANDOVER, MA  01810-0947

You must promptly notify the Internal Revenue Service of any change in your address. This will ensure we have the proper address to advise you of the status of your offer.

If you have submitted a joint offer with your spouse or former spouse and you personally are meeting or have met all the conditions of your offer agreement, but your spouse or former spouse fails to adhere to the conditions of the offer agreement, your offer agreement will not be defaulted.

continued on next page

Page 9 of 11

RE: Offer#: 060000276    Taxpayer ID#: 06-1132548

If you fail to meet any of the terms and conditions of the offer, the Internal Revenue Service will issue a notice to default the agreement. After issuance of the notice the Internal Revenue Service may:

- Immediately file suit to collect the entire unpaid balance of the offer.

- Immediately file suit to collect an amount equal to the original amount of the tax liability as liquidating damages, minus any payments already received under the terms of this offer.

- Disregard the amount of the offer and apply all amounts already paid under the offer against the original amount of the tax liability.

- File suit or levy to collect the original amount of the tax liability, without further notice of any kind.

If you have any questions, please contact the person whose name and telephone number are shown in the upper right hand corner of this letter.

Sincerely,

*Robert J. Nadeau*

ROBERT J. NADEAU
CHIEF, SPECIAL PROCEDURES

Enclosure:
cc: POA

SB Letter Accept (AOIC)

Page 10 of 11

# OFFER ACCEPTANCE REPORT

: Name:
HEALTH CARE, INC.
: Address:
K AVENUE
PORT, CT 06604

Employer Identification Number:
06-1132548
Social Security Number:

### Liability Description
(See attached transcript(s))

| ID# | Type of Tax | Tax Period | Dt Assessed | Balance as of 05/29/2000 |
|---|---|---|---|---|
| 32548 | 941 | 09/30/1997 | 08/24/1998 | |
| 32548 | 941 | 12/31/1997 | 08/24/1998 | 298,499.80 |
| 32548 | 941 | 03/31/1998 | 07/20/1998 | 255,343.81 |
| 32548 | 941 | 06/30/1998 | 09/07/1998 | 302,652.45 |
| 32548 | 941 | 09/30/1998 | 12/21/1998 | 297,064.15 |
| 32548 | 941 | 12/31/1999 | 03/20/2000 | 39,499.46 |
| -32548 | 941 | 12-31-199? | 05/01/2000 | 31,117.60 |
| 1132548 | 940 | 12/31/1998 | 12/06/1999 | 30,393.82 |
| | | | | 352,935.05 |

Total Liability: $1,607,506.14

of this Offer:
The total sum of $800,000.00 to be paid in 109 consecutive
onthly installments of $7,339.45 commencing May 20, 2000.
ie payments are due on the 20th of each month, subject to the
onditions and provisions stated on Form 656.

or acceptance of this offer:

Doubt as to Collectibility
er's assets and income are less than the tax liability.

fer is consistent with the taxpayer's ability to pay.

Recommended By _____
SMITH  Date: _____          GEORGE ZUKAUSKAS  Date: _____ 2000
OFFICER                        SPF ADVISOR/REVIEWER

ept.                           This offer meets the legal requirements
                               for compromise.
J. NADEAU  Date: 6/15/00                  Date: JUN 9 2000
SPECIAL PROCEDURES             Signature _____
                               Title of Counsel  District Counsel, CC:NER:CTE:HAR

sd Form 7249 (Rev. 1-94)
nt of the Treasury - Internal Revenue Service

Page 11 of 11